UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Michele Sacco,
　　*Plaintiff*,

　　　*v.*

Legg Mason Investment Counsel & Trust Co., N.A.,
Legg Mason, Inc., and Legg Mason Investment
Counsel, LLC,
　　*Defendants*.

Civil No. 3:07cv1384 (JBA)

September 4, 2009

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is an employment-discrimination case brought by Plaintiff Michele Sacco against her former employer. Her nine-count complaint alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, and state law. The Defendants are several entities bearing similar names: Legg Mason Investment Counsel & Trust Co., N.A.; Legg Mason, Inc.; and Legg Mason Investment Counsel, LLC (collectively, "Legg Mason"). The Court previously denied Defendants' motion to dismiss, following which the parties completed discovery. Now before the Court is Legg Mason's motion for summary judgment on all counts. As explained below, because no reasonable jury could conclude that Legg Mason is liable as Sacco alleges, Defendants' motion must be granted.

I.　　Background

Sacco's claims in this case fall into four categories. First, she alleges that the Defendants discriminated and retaliated against her because of her sex by denying her fair opportunities for promotion, denying her overtime pay, excluding her from professional meetings, treating her in a condescending and unfair manner, issuing her an inaccurate

business card, and reassigning her to new positions without notice.  Second, Sacco contends

that, through the conduct of her superiors and co-workers, she was subjected to a hostile

work environment and was constructively discharged.  Third, she charges Defendants with

violating her rights under the FMLA.  Finally, she alleges negligent and intentional infliction

of emotional distress.

Much of the factual background is undisputed, although Sacco disputes the import

of the facts as well as certain details highlighted below.  Drawing upon the parties' Local Civil

Rule 56(a) statements, the relevant facts are as follows.

A.      Sacco's Employment

In 1999, Scudder Private Investment Counsel ("Scudder") hired Sacco as a portfolio

assistant in its New York office, where she worked under portfolio manager Charles King.

Scudder was later acquired by Deutsche Bank in April 2003, and King continued to supervise

Sacco even after relocating to the Philadelphia office in 2003.  In January 2005, Legg Mason

acquired the former Scudder offices in New York, Philadelphia, Chicago, and Cincinnati

from Deutsche Bank, in a transaction with some pertinent details.  Legg Mason purchased

only certain asset-management contracts (and the associated liabilities), while Deutsche

Bank retained all pre-2005 liabilities associated with the business generally.

In conjunction with the acquisition, Sacco signed a release of liability in which she

agreed not to sue Deutsche Bank and its successors on any ground, including sex

discrimination, based on any conduct predating the agreement.  Legg Mason gave Sacco ten

days to consider the agreement and advised her to consult a lawyer if necessary, and the

agreement itself provided that it was revocable for up to seven days after signing.  Sacco

claims that she did not want to sign the agreement and that she relayed her reluctance at the

time to Kathleen Keegan, a manager in the New York office.  According to Sacco, Keegan told her that Legg Mason would not retain anyone who refused to agree to the release terms, and so Sacco signed the agreement.  (Sacco Dep. 36:11–40:7, Mar. 28, 2008, Def.'s Ex. 8 [Doc. # 53]; Sacco Aff. [Doc. # 60-3] ¶ 11.)

While Sacco was working in the New York office, there were two categories of investment employees relevant here: portfolio managers, who supervised individual client investments, and portfolio assistants, who provided administrative and technical support. During Sacco's employment, there were five portfolio managers and fifteen portfolio assistants, of whom four were men and eleven were women.  Generally speaking, it was atypical for a portfolio assistant to progress into an investment-management position (*see* Benziger Aff. ¶¶ 5–9, Defs.' Ex. 3), although Sacco contends that this was not a "rare" occurrence, and maintains that some portfolio assistants were given the opportunity for advancement (Sacco Aff. ¶ 48).

B.     Opportunities for Promotion

As a portfolio assistant, Sacco reported to King, with whom she had a "good working relationship." (Sacco Dep. 35:7–8, Mar. 28, 2008.)  When King moved to Philadelphia, he discussed with Sacco the possibility of her joining him in that office, but she declined.  Sacco first complained that she had been denied a fair opportunity for advancement.  Specifically, she alleged that two male co-workers, Steven Salerno and Justin Egan, had been granted promotions that were not made available to her, although she admittedly was not similarly qualified.  King resolved the complaints, and, according to Sacco, told her that she would get an equal opportunity as others in the future.

A male portfolio assistant, Hasan Doza, worked under portfolio manager Richard Byrnes.  When Byrnes was promoted to chief investment officer at Deutsche Bank, Doza received a similar change in duties.  Sacco cites this promotion for another assistant another lost advancement opportunity.  Doza also worked partly under another portfolio manager, Paul Benziger.  Prior to the acquisition by Legg Mason, both Sacco and Doza simultaneously received a new job title: "assistant vice president."  John Reilly, another portfolio assistant for King, received that same title some time later.  Sacco, however, continued to perform her duties as a portfolio assistant.

After Legg Mason acquired Sacco's unit at Deutsche Bank, the same job titles carried over, but the parties dispute exactly what that meant in practice.  Notably, Sacco recalls research meetings to which, once at Legg Mason, she was no longer invited.  (Sacco Aff. ¶¶ 25–28.) Benziger, the head of the New York office and the manager with the largest book of business, avers that, following the transition to Legg Mason, the managers excluded assistants from the meetings because of the need to discuss management concerns as well as portfolio issues.  (Benziger Aff. ¶¶ 13–20.) Doza, in his capacity as Byrnes's assistant, was allowed to attend the research meetings, though Sacco claims that this was on account of his gender.  The other affiliated offices, being smaller than Sacco's unit in New York, had slightly different policies with respect to attendance at the research meetings.

Prior to the 2005 acquisition, Sacco had volunteered to work on a quarterly client report for Benziger.  Once she was no longer able to attend the research meetings, however, Sacco had difficulty compiling all the information necessary to complete the report.  Although she submitted a draft version early in 2005, by December of that year the report still was not finished, and Sacco told Keegan that Benziger should get someone who attends

4

the research meetings to complete it.

As part of the transition to Legg Mason, Sacco and other portfolio assistants were reclassified as exempt employees ineligible for overtime pay.  Defendants attest that this was part of a company-wide review process that included the reclassification of other employees as well.  Later in 2005, Sacco received a business card bearing the title of "portfolio assistant" rather than "assistant vice president."  Believing that some of her male co-workers had been given the more elevated titles, Sacco complained to Keegan, who eventually corrected the mistake.

In January 2006, Doza left Legg Mason, and consequently his accounts were assigned to Sacco.  Keegan says that she was responsible for this transfer of work (Keegan Aff. ¶¶ 6–8, Defs.' Ex. 4), while Sacco attributes it to Benziger (Sacco Dep. 46:1–23, 153:2–14, May 2, 2008, Defs.' Ex. 12).  Almost immediately, Sacco complained about her increased workload, and some of the accounts were then reassigned.  Around the same time, King told Sacco that the company was looking into creating a position of junior portfolio manager, consistent with his earlier promises to her that she would have opportunities for advancement.  After some internal debate, Legg Mason posted an opening for this new position, which would entail working under Benziger, with the job description indicating that an MBA and a CFA were desired credentials.  Benziger met with his former assistant Steven Salerno, but the position was never filled.  Sacco complained about the posting as another lost opportunity for her, although she admittedly did not have an MBA and at that point had passed only the CFA level 2 exam.

Meanwhile, Sacco had begun searching for another job in January 2006.  She applied for the position of senior relationship coordinator at the Connecticut office of a related Legg

Mason entity, Legg Mason & Co., LLC. After a successful interview, Sacco was offered and then accepted this position in February 2006, and then started her new job a month later. In September 2006, however, Sacco was abruptly reassigned to a new position, which Legg Mason claims was part of a departmental reorganization. (Lattin Aff. ¶ 54, Defs.' Ex. 1.) More recently, in late 2008, Sacco was terminated, purportedly as part of a company-wide reduction in force.

C.    Offending Workplace Conduct

According to Sacco, throughout her time at Deutsche Bank and then Legg Mason, she was subjected to inappropriate conduct in various forms. From January to September 2005, Sacco's desk was located near Benziger's office. Along with other assistants sitting nearby, Sacco could overhear Benziger talking on the phone, and she recalls numerous conversations he had with his wife in which he used explicit and derogatory language. She also overheard Benziger making disparaging comments about Legg Mason employees. Benziger never directed any of these derogatory comments to Sacco, although she felt that he treated her in a condescending manner. Benziger told another assistant that she had a "nice skirt," which Sacco considered to be sexual in nature. (Sacco Dep. 64:22–65:25, Mar. 28, 2008.)

During her deposition, Sacco elaborated on the coarse language Benziger used at the Legg Mason workplace:

> A.    Talking directly to me, Mr. Benziger was just always very condescending, you know, in the way that he would talk to you about working on projects, he would treat you kind of like you were stupid, you know, that you didn't know things, he would change his mind

6

often on projects and then he would, you know, make you seem like he didn't change his mind and that you were stupid and you did it the wrong way.

As far as the—as far as cursing—he didn't curse at me.

Q.      What specifically did he say to you that was condescending or made you feel stupid?

A.      It just had to do with any work that I did with him, in particular, in the quarterly report.

Q.      Can you give me an example of something he said to you?

A.      Not really.  It was a general condescending feeling that you had when he would speak to you about any kind of work.

(*Id.* 58:14–59:8.)  Clarifying that Benziger never cursed directly at her, Sacco described some of the cursing she overheard:

Q.      Okay.  Well, tell me some of his memorable cursing?

A.      Cunt, whore, bitch, those I think he saved mostly for his ex-wife.

Q.      And is he ranting on his own or is he talking on the telephone?

A.      Ranting.  Both.  Sometimes you would hear him slam down his phone, you know, and just go off, other times he would be on the phone—he was doing work in his kitchen and he'd be on the phone with the contractor and it would be f[ ]k this, f[ ]k that, f[ ]k this.  So, you know, it was not—it wasn't pleasant to sit outside of his office.

Q.      And when you quoted him as saying cunt, whore and bitch, do you know who he was referring to?

A.      I can't say with certainty, but I believe it's his ex-wife.

(*Id.* at 60:5–8; 62:2–19.)

Sacco also complains about the conduct of another portfolio manager, William Constantine.   Sacco contends that, in addition to treating her with condescension,

7

Constantine did several offending things: he displayed an image featuring a topless woman (on a bicycle, from the rear) on his computer; he distributed inappropriate sex-themed holiday cartoons; he implied that he was having a sexual relationship with his assistant, Sandra Menke; and he arranged for Menke to receive extra compensation.  Defendants emphasize, however, that Sacco admitted in her deposition that the cartoons she saw were humorous and in fact "not offensive." (*Id.* at 99:11–100:25.)  For her part, Sacco distributed a photograph making a similar sex-related joke, and admits that this was inappropriate as well.  Defendants also explain Menke's compensation arrangement as approved by management, and including repayment for retirement benefits lost due to the organizational transition.  As for the image Constantine displayed on his computer, Sacco elaborated on the details and circumstances of this "pornographic material" during her deposition:

> Q.   Well, why don't you tell us the first instance during this one year period that Mr. Constantine was distributing pornographic material and we'll take them one at a time?

> A.   I'm just trying to see if those dates are correct.  Oh, so, that is the time period that we were at 280 Park Avenue, September of '04 to September of '05, Bill had—I call it a screensaver because it seemed like it was always there when I had to go get signatures from him on work, but I don't know if it was an e-mail or, you know, an attachment, I don't know, but he had something which was called—there were a few of them, but it was called, why are there car accidents?  And at this point we were sitting in an open environment, so he didn't really have an office, although he was in the corner, so he was the last desk of the corner and it, basically, the one—the picture that I saw often was a girl on a bicycle, she was partially nude and there [were] cars wrecking into each other because she was riding her bike down the street.

> Q.   And when you say partially nude, describe how she was attired?

> A.   She had very little bottoms on.  It was hard to tell if she had like a

> thong on or, you know, obviously, I didn't stare at it when I went over to get something signed, and he, in fact, would minimize it once he realized that you were standing there.  So, you know, she had her butt up in the air, you know, with the bicycle and it was kind of on the side so you couldn't really tell, you know, you could see that she had no top on, but it wasn't like a frontal shot with her having no top on, it was kind of a side view.

(*Id.* at 93:23–95:7.)  Sacco testified that she actually saw the image three or four times, and that, when she came up to Constantine's desk, he minimized the image so that it would not be visible.  (*Id.* at 95:11–96:8.)

    D.    Sacco's Leave

Beginning in January 2005, Sacco needed to take occasional leave in order to be with her mother, who was undergoing cancer treatment.  Benziger permitted Sacco some leave, but asked her to work as much as possible around her mother's surgery.  Sacco took additional leave in June 2005 and in February 2006, without issue.

After the company's acquisition in January 2005, Legg Mason did not distribute the handbook describing the FMLA policy until March of that year.  Due to this delay, and also based on her understanding of the policy, Sacco claims that she did not understand that her FMLA leave could be taken intermittently.  She now understands that Legg Mason's policy provided that paid leave time ran concurrently with any FMLA leave, and that employees were entitled to unpaid FMLA leave only once they exhausted their paid leave.  Although she never ran out of paid leave, Sacco claims that she was prejudiced because she had to use her vacation days wisely, and often had to travel during the night to go from her mother's side back to work.

    E.    Legg Mason's Investigation

Sacco contends that she twice complained to Keegan and another manager in 2005

about Benziger and Constantine.  She also told King about her problems with Benziger's cursing and her problems with the quarterly report.  In February 2006, after accepting the new position in Connecticut, Sacco contacted a Legg Mason president, Harry O'Mealia, about the concerns she had related to her departure.  O'Mealia  promptly met with Sacco, and he then contacted Robin Corey in corporate human resources.  Corey had some difficulty getting in touch with Sacco, and so Patty Lattin, a vice president in human resources, followed up and then met with Sacco in late March 2006.  This prompted an extensive investigation.  Human-resources personnel interviewed numerous employees in the New York office, which revealed that at least one portfolio assistant, Linda Mahon, thought that Constantine had engaged in unprofessional conduct.  Mahon further recounted how Constantine had referred to Sacco as "white trash."  (Lattin Aff. ¶ 43.)

As a result of the investigation, human-resources personnel concluded that there was no evidence to support Sacco's allegations of discrimination, abusive behavior by Benziger, or harassment by Constantine.   Constantine was formally warned about the "trash" comment, however, and he prepared a hand-written apology to Sacco.  Legg Mason further expressed that it was committed to respect in the workplace, and the human-resources department thereafter conducted training sessions that Benziger and Constantine attended.  Following the investigation, Legg Mason management also expressed to Sacco that the company wanted to further her career growth, and she was offered career counseling from senior management.  Sacco, upset based on her belief that other Legg Mason employees had been instructed not to speak to her, declined such career counseling, calling the offer "insulting" and "upsetting."  (Defs.' Ex. 30.)

II.     Discussion

Under the familiar Rule 56 standard,[1] summary judgment in favor of the Defendants is appropriate if the current record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Legg Mason challenges the legal sufficiency of each of Sacco's claims.

A.      Discrimination Claims

Sacco claims that the record shows that Legg Mason discriminated against her based on her sex in violation of Title VII and state law.[2]  Defendants deny liability, contending that Sacco has failed to make out a *prima facie* case under *McDonnell Douglas* and, in any event, cannot show that the proffered business reasons are a pretext.

The parties agree on the governing Title VII framework, under which Sacco can establish a *prima face* case of discrimination by proving: (1) her membership in a protected class; (2) that she was qualification for her position; (3) that she suffered an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of her membership in the protected class. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  Defendants do not contest the first two elements—that Sacco is a woman and was qualified.

To prove that she suffered an adverse action, Sacco must show that she "endure[d] a materially adverse change in the terms and conditions of employment," which "might be

---

[1]  *See, e.g., Rogers v. Apicella,* 606 F. Supp. 2d 272, 284–85 (D. Conn. 2009).

[2]  Sacco brings discrimination claims under both Title VII and New York State Human Rights Law.  Because claims under both statutes are analyzed under the same framework, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000), the claims will be grouped together here.

indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotation marks omitted). This requirement stems from the effort to "protect[] individuals from actions injurious to *current* employment or the ability to secure *future* employment." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997). Here, Sacco—as clarified during oral argument—identifies four adverse employment actions: the denial of promotion opportunities, the exclusion from research meetings, the denial of overtime pay, and the business-card snafu.

Because the different steps of the *McDonnell Douglas* analysis can "tend to collapse as a practical matter," *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002), even if this evidence is sufficient for Sacco to meet her *prima facie* burden, she offers no evidence supporting an inference of discrimination other than her own subjective beliefs and bare assertions that any of the Defendants' conduct was motived by her gender. Defendants explain each of these claimed adverse actions by offering legitimate business reasons: there were no denied promotions because Sacco never applied or was eligible for the positions; the assistants were excluded from research meetings so that the managers could discuss business-strategy matters; she was denied overtime pay because she (along with other male and female portfolio assistants) was reclassified as exempt; and the error on her business card was explained as a simple mistake by Keegan, another woman, and corrected. In every respect, Defendants note that Sacco received essentially the same treatment that her co-workers, both male and female, received.

In her brief, Sacco argues that these reasons are pretextual because "the only variable

12

that has changed is gender and that is the reason the Plaintiff was excluded." As the Second

Circuit has cautioned, however, "a jury cannot infer discrimination from thin air." *Lizardo*

*v. Denny's, Inc.*, 270 F.3d 95, 104 (2d Cir. 2001). There is simply no argument, supported by

authority or evidence, why Defendants' proffered reasons should not be believed. As in

*Lizardo*, Sacco has "done little more than cite to [her] mistreatment and ask the court to

conclude that it must have been related to" her sex, which is "not sufficient." *Id.*

Because there is no evidence from which a jury could conclude that Legg Mason

discriminated against her because of her gender, Defendants are entitled to summary

judgment on Sacco's discrimination claims.

B.     Retaliation

Sacco claims that Defendant's actions against her amounted to unlawful retaliation

in violation of Title VII and state law. To make out a *prima facie* showing of retaliation,

Sacco must offer evidence (1) that she was engaged in a protected activity, (2) that Legg

Mason was aware of this activity, (3) that she suffered an adverse employment action, and

(4) that there was a causal connection between her protected activity and the adverse action.

*Collins*, 305 F.3d at 118. As the Supreme Court explained in *Burlington Northern & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006), Title VII's "anti-retaliation provision protects an

individual not from all retaliation, but from retaliation that produces an injury or harm."

This is an objective standard: "a plaintiff must show that a reasonable employee would have

found the challenged action materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Id.* at 68 (quotation marks omitted). Furthermore, the Court cautioned that "normally petty

slights, minor annoyances, and simple lack of good manners" in the workplace fall short of

this standard. *Id.* If a plaintiff meets her minimal prima facie burden and the defendant counters with legitimate justifications for its actions, then the plaintiff must show that the proffered reasons are merely pretextual. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir. 1996).

At oral argument, Sacco clarified the focus of her retaliation allegations and identified two instances of protected conduct: her harassment complaint to Keegan and her meeting with O'Mealia about the work environment in the New York office. First, she contends that Benziger retaliated against her for complaining about harassment by assigning her more work following Doza's departure. Under the circumstances, however, this was not a sufficiently adverse action. Sacco has not shown that this falls within the category of actionable harm described in *Burlington Northern*. Moreover, she complained almost immediately about the additional accounts, and her workload was reduced. There is also no evidence causally linking the increase in workload to her harassment complaint, nor has she established a basis on which to conclude that Defendants' explanation for the reassignment—Doza's departure—is pretextual.

Second, Plaintiff claims that Legg Mason employees retaliated against her for complaining to O'Mealia and she links the following purportedly adverse actions to that meeting: Constantine's "trash" comment to Mahon, Sacco's belief that Legg Mason employees had been told not to speak to her, and Sacco's transfer to another position later in 2006. Constantine's comment about Sacco as "trash," however inappropriate, is not on the facts of this case the kind of material alteration in her employment that *Burlington Northern* requires to support a retaliation claim. As to Sacco's claim that there was a policy forbidding other employees from contacting her, the record is to the contrary. Another

14

employee, Ann Regal, had suggested in a voicemail message that she "can't have any contact with" Sacco, which prompted Sacco to raise the issue with O'Mealia.  O'Mealia insisted that there was no such policy and asked who had given Sacco that idea so that misconception could be corrected.  Sacco claimed in response that "there [was] no misunderstanding," and then repeated the same thing to human-resources personnel when they followed up on the same issue.  Whether or not a "no contact" policy could form the basis for a retaliation claim in another context, based on the facts in the record here such a claim cannot stand.  The only evidence of the policy was the cryptic message from Regal disavowed by management, and Sacco's refusal to provide more information precluded human resources from further disproving her belief about the policy.

Finally, Sacco points to her reassignment in September 2006.  Unquestionably, a change in job responsibilities is a material change in the terms of employment that can support a retaliation claim.  This move comes half a year after Sacco's meeting with O'Mealia.  This temporal proximity to the protected activity takes on no probative value without any other evidence, or even argument, undercutting Defendant's explanation for her reassignments as part of a department-wide reorganization effort.

Therefore, lacking evidence of a sufficiently adverse employment action causally connected to some protected activity, Sacco has not established a basis on which a jury could find for her on her retaliation claim.

C.     Hostile Work Environment

Sacco claims that, by working at Legg Mason, she was subjected to a hostile work environment based on her sex.  To prevail on such a claim, Sacco must establish two elements: "(1) that her workplace was permeated with discriminatory intimidation that was

sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (quotation marks and citations omitted). The first element "has both an objective and subjective component: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quotation marks omitted). Whether a workplace is sufficiently hostile depends on several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). At bottom, the harassment is actionable only if it amounts to "discrimination 'because of . . . sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

In her deposition and at oral argument, Sacco clarified the basis for her claim that her workplace was hostile and abusive. Although the language was never directed at her, Sacco points to Benziger's telephone conversations with his ex-wife during which he used terms including, among others, "bitch" and "whore." Sacco also references Constantine's computer image of a nude woman and his "pornographic" photocopies and cartoons.

First, there is insufficient evidence that the conduct was sufficiently severe from Sacco's subjective perspective. She admitted that she occasionally used profanity at work, that she found Constantine's dirty holiday cartoons work-inappropriate but not actually offensive, and she forwarded an e-mail message with an image of similarly suggestive sexual

content.  That Sacco participated in conduct of the same general variety cuts against her claim that Benziger and Constantine engaged in behavior that she perceived to be abusive. Second, the record does not establish that conduct was at all pervasive.  Other than saying that she saw Constantine's computer image "three or four times," Sacco gives no other context or clarification of how frequent these actions were.  And while Benziger may have used inappropriate and arguably misogynous language in the workplace, there is no basis on which to conclude that this misconduct by a single employee pervaded the Legg Mason workplace.

Third, Sacco was not the target of any of this conduct.  Although this does not preclude a jury finding of hostile work environment based on sex, contrary to Defendants' position,[3] "workplace harassment" is not "automatically discrimination because of sex merely because the words used have sexual content or connotations."  *Oncale*, 523 U.S. at 80 and "[a] work environment which is equally harsh for both men and women cannot support a claim for sex discrimination."  *Petrosino*, 385 F.3d at 221 (quotation marks omitted).  On the facts of this case, the harassing conduct Sacco describes was insufficiently

---

[3] *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 222 (2d Cir. 2004) (holding that "[t]he fact that [the] offensive material was not directed specifically at" the plaintiff "does not, as a matter of law, preclude a jury from finding that the conduct subjected [her] to a hostile work environment based on her sex").  "The critical issue" in such a case "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring).  *E.g. Pennsylvania State Police v. Suders*, 542 U.S. 129, 134–35 (2004) (discussing oral sex and pantomiming masturbation); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 328–29 (4th Cir. 2003) (discussing sexual exploits and simulating sex acts); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988) (displaying pictures of *Playboy* centerfolds); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1494–99 (M.D. Fla. 1991) (posting pictures of nude women in sex acts and disparaging women generally).

severe to have amounted to disadvantageous terms and conditions of employment based on sex.

For all of these reasons, Sacco's evidence of Benziger's and Constantine's conduct, however inappropriate, was so egregious as to constitute a sexually hostile work environment. No reasonable jury could find Legg Mason liable for creating and fostering a hostile work environment, and this claim cannot survive for trial.

### D.    FMLA Claims

Sacco alleges that Defendants willfully violated her rights under the FMLA and also retaliated against her because of those rights. Pursuant to the FMLA, "eligible employee[s]" are entitled to twelve weeks of leave per year under certain circumstances, including "[i]n order to care for the . . . parent[] of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). Such leave may be taken "intermittently or on a reduced leave schedule." § 2612(b)(1). The FMLA further makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights. § 2615(a)(1); *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004).

Sacco's claims here essentially are that, due to Legg Mason's failure to post timely and clear FMLA notice, coupled with Benziger's strict work demands, she was unable to take as much leave time to be with her ill mother as she desired. Sacco fashions her FMLA allegations as an interference claim and a retaliation claim. Under the "retaliation" analysis, the Second Circuit, applying the *McDonnell Douglas* framework, has held that an employer can be liable for violating an employee's FMLA rights if, among other things, she suffered an adverse employment action under circumstances giving rise to an inference of retaliatory intent. *Potenza*, 365 F.3d at 168. An "interference"-type claim, on the other hand, would

seek to hold an employer liable for "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Id.* at 167 (quoting 29 C.F.R. § 825.220(b)).

As Sacco conceded during oral argument, even granting that for a short time Legg Mason failed to post proper FMLA notice, she in fact received all of the paid time off that she requested. In the end, she took no leave under the FMLA because, under Legg Mason policy, she would have taken unpaid FMLA leave only once she had exhausted her paid leave. Sacco maintains that she had to use her vacation days wisely in order to maintain her paid leave, but the evidence shows that there was no actual "interference" with her FMLA rights because Benziger's work requirements and the temporary lack of notice "in no way affected [her] leave, benefits, or reinstatement." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). In addition, the only retaliatory employment action she identifies is her exclusion from research meetings, which is insufficiently adverse to give rise to an inference of retaliatory intent.

For these reasons, Sacco's FMLA claims fail as a matter of law.

E.     Remaining Claims

Finally, Sacco claims constructive discharge and negligent and intentional infliction of emotional distress, relying on essentially the same series of facts at the core of the rest of her claims.

"An employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." *Terry*, 336 F.3d at 151–52 (2d Cir. 2003). Whether working conditions rise to this level generally depends on two inquiries: "the employer's intentional

19

conduct and the intolerable level of the work conditions." *Petrosino*, 385 F.3d at 229.  The first inquiry may be satisfied by proof that "employers acted with the specific intent to prompt employees' resignations," and the second inquiry "is assessed objectively by reference to a reasonable person in the employee's position." *Id.* at 229–30.  Based on the conclusion above that Sacco's hostile-work-environment claim fails as a matter of law, it follows that her constructive-discharge claim fails as well: under either theory, a plaintiff must show that the discharge or harassment "occurred in circumstances giving rise to an inference of discrimination on the basis of her membership" in a protected class.  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).  Sacco conceded as much at oral argument, acknowledging that these claims rise and fall together.

To prevail on her emotional-distress claims, Sacco must establish that (1) the conduct by Legg Mason employees was extreme and outrageous conduct; (2) Defendants knew or should have known that this conduct would cause severe emotional distress; (3) it did cause her severe emotional distress; and (4) she was eventually constructively discharged. *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127–29 (Conn. 2003); *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986); *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).[4]  In her brief, Sacco links the grounds for these claims to her claim of hostile work environment.  Just as the evidentiary record offered in support of her harassment allegations does not support

---

[4] The parties engage in a choice-of-law analysis regarding whether the emotional-distress claims should be brought under Connecticut or New York law.  Given the disposition of these claims, the Court need not reach that issue.

a claim of discrimination based on a hostile work environment, so, too, does it fail to establish that the conduct in the Legg Mason workplace was sufficiently extreme and outrageous.

III.    Conclusion

For all these reasons, the Court concludes that no reasonable jury could find for Sacco on any of her claims against Legg Mason.  Based on this disposition on the merits, the Court need not reach Defendants' additional arguments concerning timeliness, administrative exhaustion, and the effect of the release of liability.  Accordingly, Defendants' Motion for Summary Judgment [Doc. # 49] is granted.  The Clerk is directed to close this case.


IT IS SO ORDERED.


            /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 4th day of September, 2009.